Casey, Ob. J.,
opinion:
On tbe 22d day of June, 1863, tbe claimants were tbe owners of tbe steamboat Maple Leaf. On that day she entered tbe service of tbe United States, upon tbe terms and stipulations contained in a charter-party executed on tbe 19th day of August following. By its terms tbe vessel was to be kept tight, stanch, and strong, and well and sufficiently manned, victualed, appareled, tackled, ballasted, and furnished in every respect fit for *170 merchant service, at the cost of her owners, pilotages and port charges to be paid by the United States, “ the war risk to be borne by the United States, the marine risk to be borne by the owners.”
The vessel was to be paid at the rate of $250 per day for everyday employed; and the charter-party contained also the following clauses, and upon the construction of which this controversy hinges:
“ The said vessel is valued and appraised at the sum of $50,000, and should she be retained so long in the service of the United States that the money paid and due on account of said charter (deducting therefrom the actual cost of running and keeping in repair the said vessel during the said time, together with a net profit of 33 per cent, per annum on said appraised value) shall be equal to said appraised value, then the said vessel sh all become the property of the United States without further payment,, except such sum as may then be due on account of the services of the said vessel, rendered under the said charter.
“And further, if at any time during the continuance of this charter the United States shall elect to purchase the said vessel, then they shall have the right to take her at the appraised value at the date of charter, and all money then already paid and due on account of said charter (deducting therefrom the actual cost of running and keeping in repair the said vessel during the said time, together with a net profit of 33 per cent, per annum on the original appraised value) shall apply on account of the said pinchase.”
The vessel continued in the service of the United States until the first day of April, 1864. On that day she was destroyed in the St. John’s River, Florida, by a torpedo placed there by the insurgents, and became a total loss. The owners then applied to the Third Auditor for her value, under the act of March 3, 1849, and its supplement, for the value of the boat.
The Auditor stated the account as follows:
The appraised value of the vessel is. $50,000 00
33 per cent, profit on this amount for 9 months, 8 days, and 16 hours. 12,759 40
Running expenses, per bills and affidavit, during the above period, including 6 days and 8 hours for return of crew to Boston, as per charter-party . 20,681 50
*171 Repairs, per bills and affidavit, during tlie above period, including 6 days and 8 hours for return of crew to Boston, as per charter-party. $2,572 03
86,012 93
Less payments for services during the above period. 66,125 00
Giving, as the balance due owners for the loss of their vessel, the sum of. 19,887 93-
He then decided that, under the accruing clauses in the charter-party, the vessel had become the property of the United States to the extent of all money paid on account of her service over and above the actual cost of running her and keeping her in repair, together with a net profit of 33 per cent, per annum on her appraised value. The amount of these accounts' for expenses and repairs, furnished by the claimants themselves, amounted to $23,253 53. And these the Auditor adopted as right and reasonable in his statement. He then added 33 per cent, per annum for profits on the appraised value, amounting to $12,759 40; and the aggregate of these two sums he deducted from the gross earning of the boat, $66,125, leaving the sum of $30,112 07 as the amount or value-of the appraised interest in the vessel at the time of her loss. And the balance of $19,887 93 he awarded to the claimants. His award was confirmed by the Comptroller. The balance found due by this award was paid by the United States, and received by the claimants, so far as the evidence shows, without objection or protest, and without any other or further demand upon the United States in respect of it, until the bringing of this suit, in December, 1868, more than four years afterward.
At the time of the loss of this vessel the United States, under the accruing clauses in the charter-party above quoted, had acquired an interest in the vessel, to the extent of money paid for compensation beyond the amount of the running expenses and repairs, and 33 per centum per annum on the amount of the valuation stipulated in the charter. And to the extent of such excess of payments they had become the equitaable owners of the vessel itself. Under the other clause quoted above they might at any moment have become the sole OAvners by paying to the other party the difference between that excess of compensation and the valuation stipulated in the charter- *172 party. And this shows that it was intended to be an actual and not a mere potential payment of so much of the price of the vessel. The contract was, in effect, that for the services of the vessel the owner should receive only the running expenses of the boat, all the cost' of her repairs, and 33 per centum per an-num on the valuation of the vessel. Whatever amount of the stipulated compensation should be above that was to be regarded as a payment of so much of the price on the contract of sale. The marine risk was to be borne by the claimants.
Had she perished from a peril covered by such a policy, it might be a question whether the United States would not have been entitled to share in the insurance to the extent of their equitable ownership; or, if the owners had neglected to take out such a policy, they would not themselves have been liable to the United States to the same extent. This conditional sale under this accruing clause was a marine contract, and doubtless attached to, and might have been enforced against, the vessel itself by proceedings in rem, as well as in in personam, against the owners. And while that right existed the owners could do no act which would destroy or defeat the interest thus acquired. And I know of no law authorizing any officer or agent of the United States to release or relinquish that right without receiving in return some adequate consideration therefor.
The idea and argument of claimant’s counsel, that the accruing clause can have no effect or operation until the excess of payments, over expenses, repairs, and profits, shall amount to or exceed the valuation of the boat, we think cannot be sustained $ for it is expressly coupled with the purchasing clause, and provides that at any period during the life-time of the charter-party, the United States may elect to purchase the boat, and that the excess then paid under the accruing clause shall be, ipso facto, a payment of so much of the juice, and “ shall apply on account of said purchase.” The rule claimed might operate most inequitably and unjustly upon the interests of the United States. For example, a vessel valued like this at $50,000 might have been in the service so long that the surplus due under this accruing clause should amount to $49,500. A couple of days more, and she would become the absolute property of the United States. But at this juncture a quartermaster discharges her, and gives her over into the possession of the original owner; *173 and thus this whole claim and right, according to the theory and argument so earnestly pressed upon us, is divested and relinquished. But not only so; if, instead of the vessel having* been discharged at this juncture, she perished as this one did, by a war peril, then the United States not only loses the whole amount they have paid upon the vessel, but they must pay to the owners the full amount of the valuation, although, according to the contract, they had already paid the price of the vessel, lacking only $500. The unreasonableness, injustice, and im-policy of the supposed rule, are the best and strongest arguments against its existence. The rule of interpretation we adopt, commends itself by its justice, fairness, and equity, and is in strict accordance with the plain and manifest intention of the parties, as expressed in the words and terms of their own contract.
So the claimants evidently regarded the matter themselves, at the time of the settlement of the claim by the Third Auditor and Comptroller. They received the amount awarded them without a single word of objection or protest, gave a receipt in full of it, and then slept more than four years upon their rights before they renewed any demand in respect of it in this court. We think the matter has been fairly, justly, and equitably closed, and it would be wrong to disturb it now.
The judgment of the court is that the petition be dismissed, and that the defendants go thereof without day.